### GARSTKA *v*. REPUBLIC STEEL CORP.

1. TRIAL—WITNESSES—MEANING OF LANGUAGE USED A QUESTION FOR JURY.

What a witness means by the language he uses is a question for the jury.

2. NEGLIGENCE—SIGNALMAN FOR CRANE OPERATOR—SEAMAN.

Crane operator's signalman was guilty of negligence where he either saw plaintiff seaman or had reason to believe he might be at the end of a gondola car from which steel was being transferred to boat by a crane where he could be injured by operation of the crane and plaintiff was injured by operation of the crane pursuant to signals given by the signalman.

3. SAME—TRANSFER OF STEEL FROM GONDOLA CAR TO BOAT—QUESTION FOR JURY—EVIDENCE.

In action by seaman for injuries sustained while defendant's employees were transferring steel from gondola car to boat, evi-

Anticipation of risk, see 2 Restatement, Torts, § 289.

Function of court and jury upon questions of contributory negligence, see 2 Restatement, Torts, § 476.

Landowner's liability for injury to known trespassers arising from dangerous activities or controllable forces on the land, see 2 Restatement, Torts, §§ 336, 338; his liability for dangerous conditions on the land, see 2 Restatement, Torts, § 342.

dence presented question for jury as to whether defendant's signalman had reason to believe plaintiff was in a place of danger and caused crane to be operated in such a manner as might result in injury to him.

4. SAME—CONTRIBUTORY     NEGLIGENCE—SEAMAN—LOADING     STEEL FROM GONDOLA CAR TO BOAT—CRANES.

Whether or not plaintiff seaman who had been sent by the mate to ascertain the amount of steel on a gondola car yet to be transferred to boat of which they were crew members was guilty of negligence which contributed to his injuries *held*, a question for the jury under evidence showing he failed to go to end of car opposite that near which extended housing portion of crane on next track while boom was over boat to which steel was being transferred.

5. SAME—RAILROADS—SPOTTING CARS—CRANES—QUESTION FOR JURY.

In action by seaman for injuries sustained when crushed by housing end of crane as it came into contact with end of gondola car, located on next track and from which steel was being taken and loaded in boat in crew of which plaintiff was a member, whether or not crane was being used in spotting the car by bumping it along on railroad track in a negligent manner contrary to company rules *held*, for jury under evidence showing crane to have been operated pursuant to signalman's directions but not in accordance with defendant company's rules.

6. RELEASE—COVENANT NOT TO SUE—DISMISSAL—ACTION.

Injured party's covenant not to sue employer, a boat owner, whose mate's directions were being obeyed when injury was received as result of negligence of defendant steel company's crane signalman in directing crane *held*, not to release steel company against whom right to sue was reserved and upon dismissal of action against employer a new cause of action was not thereby set up against steel company.

7. PARTIES—JOINDER—DISMISSAL OF ONE OF TWO DEFENDANTS.

Contention that defendant steel company upon whose premises plaintiff seaman was present when injured through operation of a crane engaged in transferring steel from gondola car to boat was improperly joined with boat owner *held*, without merit in view of statute providing that actions at law should not be defeated by the nonjoinder or misjoinder of parties and fact that boat owner was dismissed as a party defendant (3 Comp. Laws 1929, § 14021).

8. NEGLIGENCE—INSTRUCTIONS—CRANE OPERATOR'S SIGNALMAN.

In action by seaman against steel company whose steel was being transferred from gondola car to boat, instructions that, if

signalman who controlled operation of crane did not act as a reasonably prudent person would have acted when he knew plaintiff went ashore to the car to ascertain how much more steel was to be unloaded, the signalman would be guilty of negligence *held*, not reversible error.

9. SAME—INVITEES—LICENSEES—TRESPASSERS.

Whether a party be an invitee, licensee or trespasser, the owner of the premises is under a duty not to cause injury by active negligence and seaman sent by mate of ship onto steel company's premises to see how many bundles of steel were yet in gondola car to be unloaded was not a trespasser.

10. DAMAGES—EXCESSIVE VERDICT—PAIN AND SUFFERING—PAST AND FUTURE LOSS OF EARNINGS—LEG INJURIES.

Verdict of $18,000 to seaman *held*, not excessive where his thigh bone was crushed, he had spent 19 months with his body in a plaster cast, had sustained excruciating pain and suffering, had lost the use of his leg and faces its loss by amputation, had lost approximately $4,000 in earnings up to time of trial, and present value of loss of future earnings according to his life expectancy was $19,000, notwithstanding additional sum of $7,500 paid by employer for covenant not to sue.

CHANDLER and WIEST, JJ., dissenting.

Appeal from Wayne; Miller (Guy A.), J. Submitted April 17, 1940. (Docket No. 68, Calendar No. 41,067.) Decided September 6, 1940. Rehearing denied November 13, 1940.

Case by Walter Garstka against Republic Steel Corporation, a New Jersey corporation, and Nicholson Transit Company, a Michigan corporation, for damages for personal injuries sustained in the unloading of a boat when struck by a crane. Discontinued as to defendant Nicholson Transit Company. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Baillie & Cary*, for plaintiff.

*Howell, Roberts & Duncan* and *Leo J. Carrigan*, for defendant.

McALLISTER, J. About daybreak on the morning of October 28, 1936, Walter Garstka was working on

the wharfs of the Republic Steel Corporation along the west bank of Cuyahoga river at Cleveland, Ohio. Garstka was a sailor, having able-bodied seaman papers, with the rating of wheelsman and watchman. He was a member of the crew of the *Liberty,* a ship owned by the Nicholson Transit Company. The *Liberty* was moored to the wharf while being loaded with steel by the employees of the Republic Steel Corporation. Along the west bank of the river, and parallel to it, were four lines of railroad track. On the track nearest the river, a crane owned by defendant was being operated, lifting bundles of steel by means of a boom, cables, and hook from a gondola car standing on the track west of the crane; and depositing them in the hold of the ship. The crane and its machinery and housing were part of a railroad flat car. When the boom of the crane was swung towards the river in loading the boat, the housing revolved, swinging to the west and projecting over the adjacent track on which the gondola car was standing, slightly to the south of the crane. The crane car could be moved up and down the track by its own mechanism. In order to move gondola cars into position for unloading near the ship and to move them down the track after they are unloaded, the defendant company uses an electrical "pusher." When the "pusher" is not available, a gondola car can be moved by attaching the cable of the crane to the end of the car, and causing it to be pulled. It is a violation of the rules of the defendant company to move a gondola car by swinging the housing of the crane car over the track on which the gondola car is standing, and then causing the gondola car to be bumped or pushed by the housing of the crane car.

On the morning in question, in the gondola car, which was being unloaded, there were employees of defendant company whose duty was to attach, by

chains, bundles of steel to the hook at the end of the cable of the crane. On the ship, about 40 feet from the crane and directing the loading for the defendant company, was Andy Azre, the signalman and spotter, an employee of defendant. With him was the mate of the ship, Frank LaFay. In the hold were employees of defendant company, who unfastened the bundles when they were loaded into the ship. In order to keep the ship on even keel, the mate, after several cars had been unloaded, wanted to know how many more bundles of steel remained in the gondola car. He called to Garstka and, in the presence of Azre, told him to go over to the car and count the bundles that remained. Azre said that this was unnecessary, as he knew how much steel remained to be loaded; but upon LaFay's insistence, Garstka left the ship and went over to the car. It was about a quarter to six in the morning. When Garstka was climbing onto the gondola car, or while he was at the northeast corner of it, Azre gave the signal to Murdock, the crane operator, that caused the crane to swing out and the housing to revolve over the adjoining track, crushing Garstka between the housing and the end of the gondola car. As a result, Garstka suffered severe injuries, and brought suit against the Republic Steel Corporation for damages resulting from negligence. On a trial before a jury in Wayne circuit court, he was awarded a verdict in the amount of $18,000. Motions by defendant for judgment notwithstanding verdict and for a new trial were denied by the trial court, and defendant appeals.

In the assignments of error it is claimed that the trial court erred in submitting the question of defendant's negligence to the jury; that the undisputed evidence shows that plaintiff was guilty of contributory negligence; that there was improper joinder of the parties defendant during the course

of the proceedings; that the cause of action was barred by an agreement of settlement; and that the verdict was excessive.

Much importance is seemingly attached by defendant to the question of whether plaintiff was a licensee or invitee at the time that the accident took place. But in our opinion this is to over-emphasize questions regarding the condition of the premises and the matter relating to whether warnings of known perils were given by defendant's employees. If plaintiff is entitled to recover, it must be upon the theory that he was injured because of the negligence of defendant's employee, Azre, and not because of the maintenance of unsafe premises. The crane moved and was operated only upon signals from Azre. The crane operator could not see anything about him. Azre was the "eyes" of the operator of the crane. If Azre knew, or should have known, that plaintiff might be injured as a result of his signals in causing the crane to be moved or operated, he was negligent if he did not use ordinary care to avoid injuring Garstka; and defendant would be liable for such negligence.

It is contended by defendant that the accident occurred before daybreak and that Azre did not see Garstka as he was climbing onto the gondola car. If he had seen Garstka at one end of the gondola car and had given signals causing the crane to be operated in such a manner as would result in injury to plaintiff, there is certainly no question that Azre would clearly have been guilty of negligence. If he did not see Garstka, but had reason to believe that he might be at the end of the gondola car, where he could be injured by the operation of the crane, and thereafter, without regard for Garstka's safety, had given the signals for such operations resulting in the injuries which plaintiff

received, Azre would likewise have been guilty of negligence.

It is contended that Azre did not know Garstka had left the ship and had gone over to the gondola car. But Azre was present when Garstka received his instructions from the mate of the ship. He knew that the mate had insisted, in spite of Azre's statement that it was unnecessary, that Garstka go over and report as to the amount of steel still remaining in the gondola car. He knew that Garstka went somewhere after receiving these instructions, as Garstka did not remain with Azre and the mate, but disappeared somewhere in the dark. In this regard Azre's testimony as to his knowledge of Garstka's whereabouts just prior to the accident is pertinent. He testified:

"*Q.* On that night, what was the first time when you saw Walter Garstka, even though you don't know him by name but you ascertained afterwards? What was the first time that you saw him?

"*A.* Well, I saw him before he got hurt, and I told him—the mate asked him, 'How many lifts you got in the car?' And I told him, 'I know how many lifts; you don't have to go up there.' *And the mate says, 'Go ahead.' And he went up,* and I heard him scream, and I went up and took him off the car. * * *

"*Q.* Well, after this conversation between the mate and Garstka, what did Mr. Garstka do?

"*A. He went on the boat and on the car, and he went up to count the lifts,* so while we was putting them down in the boat, the lifts, I heard somebody scream, and naturally I stopped the bundle right where it was, and when I seen who it was, I thought it was one of our men, and went up there, and I seen him on the car, and he says, 'Take me off the car.' I grabbed hold of him and pulled him down and took him into the washroom and waited for the doctor."

Defendant strenuously contends that Azre, by the foregoing answer, "only meant to narrate what he later learned to be the fact." While the answer might be susceptible to such an interpretation, it was clearly for the jury to determine what the witness meant by the language he used; and it would seem that a most natural conclusion to be drawn by the jury was that Azre knew that defendant had gone over to the car.

Furthermore, it is claimed that Garstka was guilty of contributory negligence in climbing up at the north end of the gondola car which was nearest the crane; and that, knowing of the danger in the operation of the crane, he was guilty of contributory negligence in not using due care for his own safety. Garstka admitted that he had seen a sign: "Danger. Crane moves without warning;" but that he did not know "that the crane on the next track wouldn't clear this car on the second track. I never seen that before."

In addition, there was testimony from which the jury could conclude that the crane, instead of merely revolving and crushing plaintiff between the housing and the gondola car *in the course of loading,* was used for the deliberate purpose of bumping the gondola car on the adjoining track to a different position, by a pushing operation. Azre testified:

"*Q.* Now, how did the crane man move the car?

"*A.* I was motioning him to go.

"*Q.* Now, you say that the pusher wasn't there?

"*A.* No; he went down to spot some other car.

"*Q.* He went down to spot some other cars?

"*A.* Yes.

"*Q.* Then will you describe how this thing was handled when the crane mechanism—the crane car moved the other car? How did they do that?

"*A.* It has got a boom on that—that was sticking straight out, facing the east. The boom and the steel on it—he had to move south to put the load in

position where he wanted it; so I moved in and he happened to be up there at the same time I moved him.

"*Q.* I am not clear when you say, 'I moved him.' Will you just clear that up a little bit? You mean that you gave him a signal that he was to move the crane car toward the gondola?

"*A.* The crane?

"*Q.* Yes; move the crane toward the gondola?

"*A.* Yes.

"*Q.* When he moved the crane, did he also move the gondola?

"*A.* Yes.

"*Q.* How would he do that?

"*A.* The cab was sticking out over there. It would stick out about two or three feet, and it had to hit that car on the other track. The crane was on 228 and the car was on 229, and the cab stuck out about three feet on this 229. And naturally, when he wanted to come up close to it, it would hit it. This fellow was standing on the east end—on the north end of the car.

"*Q.* Would that have the effect of moving the car from where he was standing?

"*A.* Yes.

"*Q.* How far would it move it?

"*A.* As far as I wanted it to move.

"*Q.* In other words, the crane car could be used as a means of pushing the other car—spotting, as the railroad men say—to whatever position was necessary, so that it would be in the right position to keep on unloading?

"*A.* Yes.

"*Q. Was that the movement that was made just at the time that Garstka was hurt?*

"*A. That is just what happened.* I moved him—he was standing there—naturally, hit him. He hollered, and I went up there. That is both of his legs caught. * * *

"*Q.* Let me ask you this question, Mr. Azre: The regular method that had always been pursued in the unloading of cars was such that they used a crane

car as a pusher car to spot the cars on the other tracks. Had you ever known that to be done before?

"*A.* Yes; they usually did that because the pusher had different places to go and spot, and he had to spot the car."

While this testimony was afterward qualified and Azre sought to explain that he did not mean that he was using the crane to bump the car on the adjoining track to a new location, nevertheless the question of whether such was the fact was for the jury. Whether Garstka was negligent in not going to the far end of the gondola car was likewise for the determination of the jury.

When Garstka was climbing up at the end of the gondola car, he was on an entirely different railroad track from the track upon which the crane was being operated. He was not in danger of being struck as a result of the movement of the crane car itself. The accident resulted not because he was caught between the gondola car and the crane car but because he was caught between the housing of the crane which projected over the adjoining track as a result of the operation being directed by Azre. There was evidence from which the jury could conclude that Garstka would not have been injured unless the crane car had been used for the purpose of bumping the gondola car by the projecting housing to a new location. Under such circumstances, Garstka would have been in a position of safety *as far as the loading operation was concerned,* except for the use of the crane to move the gondola on the adjoining track, which was an operation prohibited by the rules of defendant company. Upon a review of the record we are of the opinion that the question of Azre's negligence was for the jury.

With regard to the execution by plaintiff of the covenant not to sue the Nicholson Transit Company,

such instrument would not have the effect of releasing defendant from liability. See *Cook* v. *City Transport Corp.,* 272 Mich. 91; *Slinkard* v. *National Machine & Tool Co.,* 274 Mich. 662.

On the claim of error because of improper joinder, we find no defect. Plaintiff claimed a cause of action against both defendant and the Nicholson Transit Company. Whatever would have been his legal right to recover against the Nicholson Transit Company is of no consequence in this case. He dismissed the action as to that company and proceeded to trial against defendant. No new cause of action was set up against defendant by reason of the dismissal as to the Nicholson company. It is provided by 3 Comp. Laws 1929, § 14021 (Stat. Ann. § 27.665):

"No action at law or in equity shall be defeated by the nonjoinder or misjoinder of parties. New parties may be added and parties misjoined may be dropped, by order of the court, at any stage of the cause, as the ends of justice may require."

We find no merit in defendant's contention in this regard.

Complaint is made that numerous instructions to the jury given by the trial court were erroneous. In many of such instances, defendant assumes that Azre did not know that Garstka had left the ship and had gone over to the gondola car at the time of the accident. This, as we have observed above, was a question of fact for the jury. Whether Azre could have seen plaintiff at the gondola car was also a controverted question; and whether he should have warned plaintiff of the dangers was properly submitted to the jury. The only dangers to be warned against, and to be considered by the jury, were those resulting in the accident; and these were all matters affecting the operation of the crane, not only within the knowledge of Azre but under his control. Of

the instructions, upon which claimed error is based, we refer to the following as an example:

"In the second place, he (referring to defendant) must exercise ordinary care to warn the invitee of hidden dangers which are not apparent. Now, that is a duty which is involved in this case, the duty of giving warning."

While the foregoing is not especially definite, the court, however, subsequently clearly defined its application to the case, in the following manner:

"If you find either that it was the duty of Azre to warn Garstka when the three were talking together that he intended to move the crane and to look out for that movement, or that it was the duty of Azre, knowing that Garstka went on shore and climbed up on the north end of the car, to warn him or to stop the crane, or that it was Azre's duty to ascertain where Garstka went in the performance of the orders he received from LaFay, and then, having ascertained, to give warning or to stop the crane so as to avoid a collision between the car and the crane, if you find that any one or any combination of those things would have been done by a reasonably prudent man—of course, not having been done, the conclusion would be reasonable and just by you that the Republic Steel Corporation through Azre was guilty of negligence which resulted in the collision between the housing of the crane and the north end of the gondola car and in the consequent injury of the plaintiff in the case."

The whole effect of the foregoing instruction embodies no more than that, if Azre did not act as a reasonably prudent person would have acted under the same or similar circumstances, he would have been guilty of negligence; and the same can be said of the remainder of the charge, of which complaint is made. It would, furthermore, make no difference whether Garstka was an invitee, a licensee, or a tres-

passer—and we are of the opinion that he was not a trespasser; there was a duty not to injure him by active negligence. The language and purport of the instructions give rise to no reversible error.

As to the claim that the damages were excessive, it appears that plaintiff's thigh bone was crushed; he spent 19 months with his body encased in a plaster cast; he sustained, in the language of the trial court, excruciating pain and suffering; he not only has lost the use of his leg, but faces its loss by amputation; his loss of earnings up to the time of the trial amounted to approximately $4,000; according to his life expectancy, his loss of future earnings, conservatively based upon the scale of wages which he has been paid in the past, would exceed a present value of $19,000. Considering the elements of pain and suffering, both past and reasonably to be expected in the future, together with medical expenses, we cannot say that $25,500—including the sum of $7,500 paid by the Nicholson Transit Company to the plaintiff on his covenant not to sue—is an unfairly exaggerated recovery. We are in accord with Judge Miller, who, after carefully reviewing the question of damages on a motion for a new trial, held that the verdict of $18,000 in favor of the plaintiff against the defendant is not excessive under the circumstances as revealed in this case. Other questions discussed are unimportant to our determination.

Judgment affirmed, with costs to plaintiff.

BUSHNELL, C. J., and SHARPE and NORTH, JJ., concurred with MCALLISTER, J.

WIEST, J. (*dissenting*). I am of the opinion the judgment should be reversed without a new trial and with costs to defendant under the following

rule in this jurisdiction, stated in *MacDonald* v. *Henry Hornblower & Weeks,* 268 Mich. 626, 629:

"So, where one tortfeasor is released from liability on payment of part of the damage, the others are discharged although the contract expressly reserves right of action against them. *McBride* v. *Scott,* 132 Mich. 176 (61 L. R. A. 445, 102 Am. St. Rep. 416, 1 Ann. Cas. 61, 13 Am. Neg. Rep. 335); *Sunlin* v. *Skutt,* 133 Mich. 208; *Lindsay* v. *Acme Cement Plaster Co.,* 220 Mich. 367; *Moffit* v. *Endtz,* 232 Mich. 2."

Suit was brought against the Nicholson Transit Company for negligence causing personal injury to plaintiff. Later, by amendment, the Republic Steel Corporation was made a defendant as a joint tortfeasor. Thereafter, plaintiff, by indenture, under seal, witnessed and notarized, in consideration of $7,500 paid to him by the Nicholson Transit Company, expressly covenanted with the transit company to discontinue his action against that company, reciting, however, that the covenant not to sue the transit company did not in any wise affect the suit pending against the Republic Steel Corporation to recover the full measure of damages occasioned him. Leave was then asked of the court to discontinue as to the original defendant, the transit company, and the court permitted such discontinuance without prejudice. An amended declaration was then filed against the steel corporation as sole defendant. At the trial the court instructed the jury, if they found for the plaintiff:

"Now, having arrived at the present value of loss of his future earnings, you then will add, total all of the different factors that I have mentioned, find the total loss that he will sustain, and then subtract from that total loss the sum of $7,500 which he has already obtained from the Nicholson Transit Com-

pany.  The reason for requiring that subtraction of that $7,500 is that he is entitled to only one recovery for the injury, and I have given you the rules for ascertaining what the whole injury is, and he, having received $7,500 on account already, must give this defendant credit for that $7,500 from the sum of the total injury.''

Defendant contends this settlement with one alleged tortfeasor was a satisfaction as to the other joint tortfeasor, and the court was in error in not so holding upon the various motions made by defendant and also in the mentioned instruction to the jury.

Here we have an instance of a suit against an alleged tortfeasor, amended by suit against an alleged joint tortfeasor, settlement, while such suit was pending, with one alleged joint tortfeasor, followed by verdict under instruction of joint liability, with deduction of liability of one to the amount received by plaintiff by settlement with the other, and judgment thereon.  This treated liability as joint and brings the case squarely within the rule above mentioned and not within the rule applied in *Slinkard* v*. National Machine & Tool Co.*, 274 Mich. 662, and *Cook* v. *City Transport Corp.*, 272 Mich. 91.

The released defendant paid plaintiff $7,500 for discontinuance of the action pending against it as a joint tortfeasor, and this amount is reflected in reduction of the judgment against its fellow tortfeasor.  As before stated, this was error.

CHANDLER, J., concurred with WIEST, J. BUTZEL, J., did not sit.  The late Justice POTTER took no part in this decision.